**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 25-CV-20476-MOORE/Elfenbein

**TOTTENHAM HOTSPUR LIMITED**,

      Plaintiff,

v.

**THE PARTNERSHIPS AND**
**UNINCORPORATED ASSOCIATIONS**
**IDENTIFIED ON SCHEDULE A**,

      Defendants.

_____/

**REPORT AND RECOMMENDATION ON MOTION FOR DEFAULT JUDGMENT**

**THIS CAUSE** is before the Court on Plaintiff Tottenham Hotspur Limited's Motion for Default Judgment (the "Motion"). *See* ECF No. [32]. The Honorable K. Michael Moore referred the Motion to me "to take all necessary and proper action as required by law and/or issue a Report and Recommendation regarding Plaintiff's Motion for Default Judgment." *See* ECF No. [34]. For the reasons explained below, I respectfully **RECOMMEND** that the Motion, **ECF No. [32]**, be **DENIED WITHOUT PREJUDICE**.

## I.     BACKGROUND[1]

Plaintiff, Tottenham Hotspur Limited, is a professional football club based in Tottenham, England that competes in the English Premier League, the highest level of the English football league system. *See* ECF No. [1] at ¶¶4, 6; ECF No. [16-2] at ¶3. Plaintiff owns the following

---

[1] Because Plaintiff has obtained a clerk's entry of default, *see* ECF No. [29], the Court accepts as true the well-pleaded factual allegations of the Amended Complaint, *see TracFone Wireless, Inc. v. Hernandez*, 196 F. Supp. 3d 1289, 1298 (S.D. Fla. 2016), but not its conclusions of law, *see Surtain v. Hamlin Terrace Found*, 789 F.3d 1239, 1245 (11th Cir. 2015).

CASE NO. 25-CV-20476-MOORE/Elfenbein

federally registered trademarks (collectively, the "Tottenham Trademarks"), *see* ECF No. [1] at

¶10, which are valid and enforceable, *see* ECF No. [1] at ¶11:

| Registration No. | Trademark |
|---|---|
| 2,980,045 5,005,441 | TOTTENHAM HOTSPUR |
| 5,005,438 | HOTSPUR |
| 5,139,349 | COYS |
| 2,952,962 |  |
| 2,952,963 |  |
| 4,903,214 |  |
| 4,903,251 |  |

| Registration No. | Trademark |
|---|---|
| 4,903,257 |  |
| 4,929,549 |  |

Plaintiff is, in part, engaged in producing, manufacturing, and distributing premium athletic apparel, accessories, and other products within this judicial district and throughout the United States (collectively, the "Tottenham Products"), which prominently feature the famous, internationally recognized, federally registered trademarks.  *See* ECF No. [1] at ¶7.  Tottenham Products typically include one or more of the Tottenham Trademarks.  *See* ECF No. [1] at ¶10. Plaintiff is considered the eighth most famous football club in the world valued at $3.2 billion. *See* ECF No. [1] at ¶8.  For generations, Plaintiff has been among the leaders in the field of apparel and accessories.  *See* ECF No. [1] at ¶7.  Tottenham Products are sold to consumers through Plaintiff's official website, tottenhamhotspur.com, and through authorized retailers like DICK's Sporting Goods.  *See* ECF [1] at ¶9.

Plaintiff has invested millions of dollars annually to market and promote the Tottenham Products that feature the Tottenham Trademarks.  *See* ECF No. [1] at ¶12.  Tottenham Products have become Plaintiff's valuable assets due to their widespread fame, outstanding reputation, and significant goodwill associated with the brand.  *See* ECF No. [1] at ¶15.  The brand's success resulted in substantial counterfeiting of the Tottenham Trademarks, which Plaintiff has tried to

3

combat through a trademark protection and enforcement program done in collaboration with the English Premier League to investigate suspicious e-commerce stores and to enforce the protection of their trademark rights. *See* ECF No. [1] at ¶4. In recent years, Plaintiff identified numerous fully interactive e-commerce stores that were offering for sale or selling unauthorized and unlicensed products, including apparel, bearing infringing and counterfeit versions of Plaintiff's federally registered trademarks to consumers throughout the United States (the "Counterfeit Products"). *See* ECF No. [1] at ¶19.

Defendants are unknown individuals and business entities that create these e-commerce stores under the seller aliases identified in Schedule A (the "Seller Aliases") that "are advertising, offering for sale, and selling Counterfeit Products to unknowing consumers" in this judicial district and throughout the United States. *See* ECF No. [1] at ¶5. They "facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers." *See* ECF No. [1] at ¶22. Defendants' e-commerce stores "appear sophisticated and accept payment in U.S. dollars and/or funds from U.S. bank accounts" and "often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer." *See* ECF No. [1] at ¶22. However, Plaintiff has neither licensed nor authorized Defendants to use any of the Tottenham Trademarks, and they are not authorized retailers of genuine Tottenham Products. *See* ECF No. [1] at ¶22.

Third-party service providers, like those Defendants use, do not require sellers to verify and confirm their identities or identify an underlying business entity, thereby allowing counterfeiters to have multiple seemingly unrelated, but commonly owned, profiles that "create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of

counterfeits or counterfeiters." *See* ECF No. [1] at ¶20. "E-commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to off-shore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to Plaintiff." *See* ECF No. [1] at ¶28.

On January 31, 2025, Plaintiff filed a Complaint to "combat e-commerce store operators who trade upon Plaintiff's reputation and goodwill by offering for sale and/or selling unauthorized and unlicensed products." *See* ECF No. [1] at ¶4. The Complaint includes two claims: (1) trademark counterfeiting and infringement, in violation of 15 U.S.C. § 1114; and (2) false designation of origin, in violation of 15 U.S.C. § 1125(a). ECF No. [1] at 12–14. In the Complaint, Plaintiff seeks temporary, preliminary, and permanent injunctions pursuant to 15 U.S.C. § 1116, 28 U.S.C. § 1651(a), The All Writs Act, and Rule 65 to prevent Defendants from selling the counterfeit products. *See* ECF No. [1] at 14-16. Plaintiff also seeks monetary relief in the amount of Defendants' profits from selling the counterfeit products or alternatively statutory damages as allowed under 15 U.S.C. § 1117. *See* ECF No. [1] at 14-16.

On February 27, 2025, Plaintiff filed the *Ex Parte* Motion for Entry of Temporary Restraining Order and Preliminary Injunction, Temporary Injunction, Temporary Asset Restraint, and Expedited Discovery. *See* ECF No. [16]. Judge Moore thereafter issued a temporary restraining order in which he referred the request for a preliminary injunction to the undersigned and granted Plaintiff's *Ex Parte* Motion for Electronic Service of Process Pursuant to Rule 4(f)(3). *See* ECF No. [17]; ECF No. [11]; ECF No. [19]. Plaintiff served Defendants with all filings in this matter by email and through the designated serving notice website, including a copy of the Court's Order Setting Preliminary Injunction Hearing, but Defendants did not respond to the

motion or otherwise object to its entry, and they were not present at the Preliminary Injunction Hearing. *See* ECF No. [21]; ECF No. [20]; ECF No. [25].

The undersigned then issued a Report and Recommendation recommending the entry of a preliminary injunction, which Judge Moore adopted and entered. *See* ECF No. [26] and ECF No. [31]. Following Plaintiff's Motion for Clerk's Entry of Default pursuant to Rule 55(a), the clerk entered a default against Defendants on April 14, 2025. *See* ECF No. [28]; ECF No. [29]. Plaintiff thereafter timely filed its Motion for Default Judgment pursuant to Rule 55(b). *See* ECF No. [30]; ECF No. [32]. The Court must now determine whether there is a sufficient basis in the pleadings for default judgment to be entered.

## II.   LEGAL STANDARDS

### A.  Default Judgment Standard

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55 (a). After the clerk enters a default, the Court is authorized to enter a final default judgment if the party seeking it applies for one. *See* Fed. R. Civ. P. 55 (b)(2); *Surtain*, 789 F.3d at 1244 ("When a defendant has failed to plead or defend, a district court may enter judgment by default.").

"A 'defendant, by his default, admits the plaintiff's well-pleaded allegations of fact' as set forth in the operative complaint." *TracFone*, 196 F. Supp. 3d at 1298 (quoting *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009)). But the defendant "is not held to admit facts that are not well-pleaded or to admit conclusions of law." *Surtain*, 789 F.3d at 1245 (quotation marks omitted). And a defendant's default does not automatically permit the Court to enter a default judgment: "Because the defendant is not held to

6

admit facts that are not well pleaded or to admit conclusions of law, the court must first determine whether there is a sufficient basis in the pleading for the judgment to be entered." *Chanel, Inc. v. Replicachanelbag*, 362 F. Supp. 3d 1256, 1259 (S.D. Fla. 2019); *see also Surtain*, 789 F.3d at 1245 ("Entry of default judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered." (quotation marks omitted)).

The Eleventh Circuit has "interpreted the standard" for evaluating whether a sufficient basis for default judgment exists "as being akin to that necessary to survive a motion to dismiss for failure to state a claim." *Surtain*, 789 F.3d at 1245; *see also Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n.41 (11th Cir. 1997) ("[A] default judgment cannot stand on a complaint that fails to state a claim."). Of course, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "This plausibility standard is met 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Surtain*, 789 F.3d at 1245 (quoting *Iqbal*, 556 U.S. at 678).

**B. Trademark and Unfair Competition Law**

**1. Federal Trademark Infringement (15 U.S.C. § 1114)**

"Section 32 of the Lanham Act, 15 U.S.C. § 1114, provides liability for trademark infringement if, without the consent of the registrant, a defendant uses 'in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark: which is likely to cause confusion, or to cause mistake, or to deceive.'" *Chanel, Inc.*, 362 F. Supp. 3d at 1262 (quoting 15 U.S.C. § 1114). "To prevail on a trademark infringement claim under 15 U.S.C. § 1114, the plaintiff must show that it owns a valid trademark, that its mark has priority, that the defendant

used such mark in commerce without the plaintiff's consent, and that the defendant's use is likely to cause consumer confusion as to the source, affiliation or sponsorship of its goods or services." *Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F. Supp. 2d 1261, 1264–65 (S.D. Fla. 1999); *see also Chanel, Inc.*, 362 F. Supp. 3d at 1262 (consolidating those four elements into two: plaintiff "had prior rights to the mark at issue" and defendants "adopted a mark or name that was the same, or confusingly similar to" it "such that consumers were likely to confuse the two").

Registration of a mark with the United States Patent and Trademark Office ("USPTO") is "prima facie evidence" of its "validity," "the registrant's ownership of" it, and "the registrant's exclusive right to use" it "in commerce" or "in connection with the goods or services specified in the registration." *See* 15 U.S.C. § 1115(a). A plaintiff's mark has priority if the plaintiff began using the mark before the defendant began using its competing mark. *See PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1218 (S.D. Fla. 2004) (noting that plaintiff's mark had priority because it had been selling its products for five years before defendant created the competing domain names). One way a defendant can use a mark in commerce is by "establishing a website on the Internet" that contains the mark. *See id.*

"In determining the likelihood of confusion, the court must analyze the following seven factors: (1) the type of trademark; (2) the similarity of the marks; (3) the similarity of the products the marks represent; (4) the similarity of the parties' retail outlets and purchasers; (5) the similarity of the advertising media used; (6) the defendant's intent; and (7) actual confusion." *Carnival Corp.*, 74 F. Supp. 2d at 1265. There are "four categories" of marks: generic; descriptive; suggestive; and "fictitious, arbitrary or fanciful." *See Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1540 (11th Cir. 1985) (citation omitted). "The categories are based on the relationship between the name and the service or good it describes." *Frehling Enters., Inc. v. Int'l Select Grp.,*

*Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).

> The Eleventh Circuit has described the difference between the categories this way:
>
> The demarcation between each category is more blurred than it is definite. A term which suggests the basic nature of the service is generic. The term Milk Delivery is an example of a generic service mark for a hypothetical milk delivery service. A generic term is typically incapable of achieving service mark protection because it has no distinctiveness. A descriptive term merely identifies a characteristic or quality of a service. An example of a descriptive service mark might be BarnMilk. Because a descriptive service mark is not inherently distinctive, it may be protected only if it acquires a secondary meaning. The personal name component of a service mark such as Barney's to denote a milk delivery service is also considered not inherently distinctive and hence merely descriptive. However, if the personal name mark acquires secondary meaning, it is afforded the strength of an inherently distinctive mark. Marks which are descriptive of geographic location of the source of the service are treated in the same manner as personal name marks. A suggestive term suggests the characteristics of the service and requires an effort of the imagination by the consumer in order to be understood as descriptive of the service. Barn–Barn is an example of a suggestive term. Because a suggestive service mark is inherently distinctive, no proof of secondary meaning is required for it to be protectable. An arbitrary or fanciful term bears no relationship to the service. Arbitrary and fanciful terms are also inherently distinctive, so they are protectable without proof of secondary meaning. Barnbarnfish is an example of an arbitrary or fanciful service mark.

*Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1522–23 (11th Cir. 1991) (cleaned up); *see also Frehling Enters., Inc.*, 192 F.3d at 1335 ("An arbitrary mark is a word or phrase that bears no relationship to the product (e.g., 'Sun Bank' is arbitrary when applied to banking services)."); *Laite*, 756 F.2d at 1540 (noting that suggestive marks are "comparatively weak" but "will be protected without proof of secondary meaning" and that fictitious/arbitrary/fanciful marks are "generally inherently distinctive" and therefore "strong" and "afforded the widest ambit of protection").

"The issue of likelihood of confusion is not determined by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists. Rather, a court must evaluate the weight to be accorded the individual factors and then make its ultimate decision. The

appropriate weight to be given to each of these factors varies with the circumstances of the case." *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1346 (11th Cir. 2012) (citations omitted).  "Of these factors, the type of mark and the evidence of actual confusion are the most important in this circuit," *Dieter*, 880 F.2d at 326, but actual confusion "is obviously not a prerequisite to a finding of likelihood of confusion, as it is one of seven factors considered in the likelihood-of-confusion determination," *Wreal, LLC*, 38 F.4th at 137.  "In reviewing the evidence, there are no set rules as to how much evidence of confusion is needed; rather, a district court must take into consideration the circumstances surrounding each particular case." *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 122 F.3d 1379, 1382 (11th Cir. 1997) (quotation marks omitted).

## 2.  Federal Unfair Competition/False Designation of Origin (15 U.S.C. § 1125(a))

"Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition in interstate commerce, and forbids unfair trade practices involving infringement of trademarks, even in the absence of federal trademark registration."  *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007) (alteration adopted, quotation marks omitted). "Section 43(a) is remedial in nature and should be interpreted and applied broadly so as to effectuate its remedial purpose." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir. 2001).  "The law of unfair competition has its roots in the common-law tort of deceit: its general concern is with protecting consumers from confusion as to source." *Suntree Techs.*, 693 F.3d at 1346 (citation and emphasis omitted).  "Common law and statutory trademark infringements are merely specific aspects of unfair competition." *Planetary Motion, Inc.*, 261 F.3d at 1193–94 n.5.

"To state a claim for unfair competition and false designation of origin, a plaintiff must

show (1) that the plaintiff had enforceable trademark rights in the mark or name, and (2) that the defendant made unauthorized use of it such that consumers were likely to confuse the two," *Brain Pharma, LLC v. Scalini*, 858 F. Supp. 2d 1349, 1355–56 (S.D. Fla. 2012) (quotation marks omitted), which are the same elements required "to prevail on [a] federal claim of trademark infringement," *Suntree Techs.*, 693 F.3d at 1346.  *Cf. Chanel, Inc.*, 362 F. Supp. 3d at 1262 (explaining that the "test for liability for false designation of origin under 15 U.S.C. § 1125(a) is the same as for a trademark counterfeiting and infringement claim – i.e., whether the public is likely to be deceived or confused by the similarity of the marks at issue").  Because the "legal standard for unfair competition under both the Lanham Act and the common law has been held to be essentially the same as the standard for trademark infringement," courts "apply the same seven-factor 'likelihood of confusion' test to claims brought under 15 U.S.C. § 1125(a) as well as infringement claims." *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 91 F. Supp. 3d 1265, 1284–85 (S.D. Fla. 2015).  A false designation of origin claim "proscribes the behavior of passing off or palming off, which occurs when a producer misrepresents his own goods or services as someone else's." *Custom Mfg.*, 508 F.3d at 647 (quotation marks omitted).

## C.  Forms of Relief Available in Trademark Cases

### 1.  Permanent Injunction

A district court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title." *See* 15 U.S.C. § 1116(a).  Indeed, injunctive relief "is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Burger*

*King Corp. v. Agad*, 911 F. Supp. 1499, 1509–10 (S.D. Fla. 1995) (quotation marks omitted).  In

"ordinary trademark infringement actions complete injunctions against the infringing party are the

order of the day.  The reason is simple: the public deserves not to be led astray by the use of

inevitably confusing marks — even in cases in which more than one entity has a legal right to use

the mark."  *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir.

2008) (alteration adopted, citation and quotation marks omitted).

"Under traditional equitable principles, a plaintiff seeking a permanent injunction must

demonstrate (1) it has suffered an irreparable injury; (2) remedies available at law, such as

monetary damages, are inadequate to compensate for that injury; (3) considering the balance of

hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public

interest would not be disserved by a permanent injunction."  *Id.* at 1208.  In "trademark cases, a

sufficiently strong showing of likelihood of confusion may by itself constitute a showing of a

substantial threat of irreparable harm."  *Chanel, Inc.*, 362 F. Supp. 3d at 1263 (alteration adopted,

quotation marks omitted).

In this Circuit, courts apply a "presumption of irreparable harm once a plaintiff establishes

a likelihood of success on the merits of a trademark infringement claim" because "infringement

by its nature causes irreparable harm."  *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp.

2d 1279, 1287 (S.D. Fla. 2010) (quotation marks omitted).  The same presumption applies when

analyzing permanent injunctions.  *Id.* at 1287 n.4; *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S.

531, 546 n.12 (1987) (explaining that the "standard for a preliminary injunction is essentially the

same as for a permanent injunction with the exception that the plaintiff must show a likelihood of

success on the merits rather than actual success"); 15 U.S.C. § 1116(a) (noting that a plaintiff

"shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation

identified in this subsection in the case of a motion for a permanent injunction").

"[E]ven in a default judgment setting, injunctive relief is available." *Chanel, Inc.*, 362 F. Supp. 3d at 1263.  In fact, a defendant's "failure to respond or otherwise appear . . . makes it difficult for" a plaintiff "to prevent further infringement absent an injunction." *Id.*  If a court determines that an injunction is warranted, its "broad equity powers allow it to fashion" whatever kind of injunctive relief is "necessary to stop" a defendant's "infringing activities." *Id.* at 1264.

### 2.  Other Equitable Relief

Along with permanent injunctions, the Court's broad equity powers allow it to fashion whatever relief is necessary to stop or remedy infringing activities in a particular case.  *See, e.g.*, *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971).  "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Id.*  "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Id.* (quotation marks omitted).  "Equity has power to eradicate the evils of a condemned scheme by prohibition of the use of admittedly valid parts of an invalid whole." *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 724 (1944).

Courts may fashion equitable relief "to eliminate the means by which" defendants conduct "their unlawful activities." *See, e.g.*, *Chanel, Inc. v. besumart.com*, 240 F. Supp. 3d 1283, 1291 (S.D. Fla. 2016). Courts also have the inherent authority to order the transfer of any assets that were restrained "to assure the availability of permanent relief," such as funds that can be "used to satisfy an equitable award of profits." *Cf. Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995) (recognizing a court's inherent authority "to order preliminary relief,

including an asset freeze" to "assure the availability of permanent relief").

### 3. Statutory Damages

"In a case involving the use of a counterfeit mark . . . in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect . . . to recover, instead of actual damages and profits . . . an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services." 15 U.S.C. § 1117(c). Those statutory damages can be "in the amount of . . . not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just," or "if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(1)–(2). And as with any other "money judgment in a civil case recovered in a district court," "[i]nterest shall be allowed." 28 U.S.C. § 1961(a); *see also id.* § 1961(b) (explaining that interest "shall be computed daily" and "compounded annually").

Courts in this District have "defined willful infringement as when the infringer acted with actual knowledge or reckless disregard for whether its conduct infringed upon the plaintiff's copyright." *See PetMed Express, Inc.*, 336 F. Supp. 2d at 1219 (quotation marks omitted). In addition, courts "may infer that Defendants willfully infringed Plaintiff['s] copyrights because of Defendants' default." *Arista Recs., Inc. v. Beker Enterprises, Inc.*, 298 F. Supp. 2d 1310, 1313 (S.D. Fla. 2003). "An award of statutory damages is appropriate despite a plaintiff's inability to provide actual damages caused by a defendant's infringement." *See besumart.com*, 240 F. Supp. 3d at 1292. "Indeed, Congress enacted a statutory damages remedy in trademark counterfeiting cases because evidence of a defendant's profits in such cases is almost impossible to ascertain." *Id.* Overall, "[d]istrict courts have wide discretion in awarding statutory damages." *PetMed*

*Express, Inc.*, 336 F. Supp. 2d at 1219.

## III.   DISCUSSION

As mentioned previously, Plaintiff moves for a final default judgment, a permanent injunction, other forms of injunctive relief, and statutory damages.  *See* ECF No. [32] at 1, 4-6, 13-14.  Because injunctive relief is warranted only if Defendants violated one or more of Plaintiff's trademark rights, *see, e.g.*, 15 U.S.C. § 1116(a); *Agad*, 911 F. Supp. at 1509–10, the Court first assesses whether Plaintiff is due a final default judgment on its counterfeiting, infringement, and false designation of origin claims, *see* ECF No. [1] at 12–14, before evaluating whether it is entitled to a permanent injunction, other equitable relief, or statutory damages.

### A.   Final Default Judgment

Plaintiff has already obtained a clerk's default, *see* ECF No. [29], so final default judgment is appropriate if there is "a sufficient basis" for it in the Complaint, *see Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245.  There is "a sufficient basis" for default judgment if Plaintiff alleged facts that when accepted as true "state a claim for relief that is plausible on its face."  *See Iqbal*, 556 U.S. at 678.  Plaintiff must have pleaded sufficient facts to allow "the court to draw the reasonable inference" that Defendants are liable for trademark infringement, counterfeiting, and false designation of origin.  *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41.  Of course, for Defendants to be found liable for the claims against them, Plaintiff must have pleaded factual content establishing each element of those claims.

#### 1.   Federal Counterfeiting and Trademark Infringement (Count I)

To prove a trademark infringement claim under § 1114, Plaintiff must show: (1) it owns a valid trademark; (2) its mark has priority; (3) Defendants used such mark in commerce without its consent; and (4) Defendants' use of the mark is likely to cause consumer confusion.  *See Carnival*

*Corp.*, 74 F. Supp. 2d at 1264–65; *Chanel, Inc.*, 362 F. Supp. 3d at 1262. Plaintiff's well-pleaded allegations satisfy this standard. *See TracFone*, 196 F. Supp. 3d at 1298.

Starting with the first factor, whether Plaintiff owns a valid trademark, the Court finds that the Tottenham Trademarks are indeed valid. Plaintiff "has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the [Tottenham] Trademarks." *See* ECF No. [1] at ¶16. Plaintiff's Tottenham Trademarks are included in Tottenham Products which "have long been among the most popular in the world," *see* ECF No. [1] at ¶12, and those products have been sold "[f]or many years" at the official tottenhamhotspur.com website. *See* ECF No. [1] at ¶14. Plaintiff has "extensively promoted and advertised at great expense" products bearing the Tottenham Trademarks such that the "inherent distinctiveness of the marks" suggests to the purchaser "that the products come from [Plaintiff] and are manufactured to [Plaintiff's] quality standards." *See* ECF No. [1] at ¶13. Tottenham Products are "famous throughout the United States." *See* ECF No. [1] at ¶12. Therefore, the Court agrees with Plaintiff that it owns common law trademark rights in the marks. *See* ECF No. [1] at ¶10; *Surtain*, 789 F.3d at 1245 (noting that a defaulted defendant is not held to admit conclusions of law). Plaintiff has also registered its marks with the USPTO. *Id.* The registrations of Plaintiff's trademarks "are valid, subsisting, in full force and effect" and they "have been used exclusively and continuously by [Plaintiff] and have never been abandoned." *See* ECF No. [1] at ¶11. Therefore, Plaintiff has statutory trademark rights as well. *See* 15 U.S.C. § 1115(a).

Plaintiff also has priority in the marks given Plaintiff's "long-standing use" of its registered trademarks, *see* ECF No. [1] at ¶10, and its online promotions and sales of the Tottenham Products "[f]or many years" on the official tottenhamhotspur.com website, *see* ECF No. [1] at ¶14. Further, as alleged in the Complaint and as reflected in the USPTO registrations referenced in the

Complaint[2], the Tottenham Marks are incontestable. *See* ECF No. [1] at ¶11; ECF No. [16-3]; *see also* 15 U.S.C. § 1065 (subject to certain defenses, "the right of the owner to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable"); *Death Wish Coffee, LLC v. Death Hell Coffee, LLC*, No. 23-CV-1100-PGB-RMN, 2024 WL 1941728 (M.D. Fla. Mar. 20 2024) (finding that complaint sufficiently alleged trademark infringement on motion for default judgment, in part, when the plaintiff's two registrations constituted *prima facie* evidence of the marks' validity and both marks were incontestable).

As to the third factor, whether Defendants used Plaintiff's mark in commerce without permission, Plaintiff has also satisfied this requirement. The Complaint alleges that Defendants set up and operated "e-commerce stores that target United States consumers using one or more Seller Aliases," *see* ECF No. [1] at ¶21, through which they "have sold, offered to sell, marketed, distributed, advertised, and are still selling, offering to sell, marketing, distributing, and advertising products" using the Tottenham Trademarks "without Plaintiff's permission." *See* ECF No. [1] at ¶33. These e-commerce stores are considered in commerce because they are made available through websites online. *See PetMed Express, Inc.*, 336 F. Supp. 2d at 1218. And Defendants

---

[2] The Court also takes the facts from the USPTO registrations, which Plaintiff referred to in the Complaint and filed with an affidavit in support of the Motion for Preliminary Injunction. *See* ECF No. [16-3]; *ROOR v. Sanz Bros., LLC,* No. 16-CV-61429, 2018 WL 1881287, at *5 (S.D. Fla. Mar. 1, 2018), *report and recommendation adopted,* No. 16-CV-61429, 2018 WL 1875621 (S.D. Fla. Mar. 7, 2018) (explaining that, based on Eleventh Circuit precedent, "a document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are central to the plaintiff's claim, is referenced in the complaint and no party questions the authenticity of the document." (citing *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2007)); *Transcendent Mktg. & Dev., LLC v. C & C Prop. Invs., LLC*, No. 23-CV-318, 2025 WL 687057, at *2 (S.D. Ga. Mar. 4, 2025) (stating that, on default judgment, a court may consider evidence presented in an affidavit or declaration).

have not been licensed or authorized "to use any of the [Tottenham] Trademarks and none of the Defendants are authorized retailers." *See* ECF No. [1] at ¶22. Accordingly, the Court finds that this factor has been satisfied.

That leaves the question of whether Plaintiff has established that Defendants' use is likely to cause consumer confusion. When "counterfeit marks are involved, application of the[ consumer confusion] factors may not be necessary." *See Am. Airlines, Inc. v. Spada*, No. 23-CV-21844, 2024 WL 4472016, at *9 (S.D. Fla. Sept. 21, 2024) (citing *Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340, 1359 (S.D. Fla. 2017)). This is because the consumer confusion factors "are more geared towards comparing two distinct, albeit similar, marks," but "application of the factors is unnecessary where use of an identical mark—that is, a counterfeit mark—is at issue." *Id.* A counterfeit mark "is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. A counterfeit mark is inherently confusing because it is identical to a protected mark, so consumer confusion can be presumed. *See Am. Airlines*, 2024 WL 4472016 at *9 (citing *See Casa Dimitri Corp.*, 270 F. Supp. 3d at 1359). Indeed, courts often presume consumer confusion when the marks at issue are counterfeits. *See Burger King Corp. v. Huynh*, No. 11-CV-22602, 2011 WL 6190163, at *4 (S.D. Fla. Dec. 5, 2011) (finding that a "labored analysis" of consumer confusion was unnecessary when the infringing mark was not merely similar to the protected mark but was one in the same with the protected mark); *Nike Inc. v. Variety Wholesalers, Inc.*, 274 F. Supp. 2d 1352, 1368 (S.D. Ga. 2003), *aff'd*, 107 F. App'x 183 (11th Cir. 2004) (explaining that the defendant's "use of marks identical or substantially identical to the registered Nike trademarks was likely to cause confusion in the minds of potential buyers as to the source, affiliation or sponsorship" of the infringing products); *Monsanto Co. v. Campuzano*, 206 F. Supp. 2d 1252, 1262 (S.D. Fla. 2002) ("I presume

that the counterfeit items caused public confusion in the marketplace, as the counterfeit marks and the genuine marks are substantially identical both in design and use and it is undisputed that the counterfeit marks were sold to the public."); *Daimler AG v. A-Z Wheels LLC*, 334 F. Supp. 3d 1087, 1099 (S.D. Cal. 2018) ("Again, the Court finds it unnecessary to analyze the likelihood of confusion test because the marks are identical.").  Here, because Defendants' products involve counterfeit items, Plaintiff satisfies the consumer confusion element.

Having pled sufficient factual matter to establish that Defendants' products are likely to cause consumer confusion with Tottenham Trademarks and Products, all four elements of federal trademark infringement under § 1114 have been satisfied and Plaintiff has stated a claim to relief that is plausible on its face. *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41; *Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245. Accordingly, Plaintiff is entitled to a final default judgment on Count I.

### 2.  Federal False Designation of Origin (Count II)

Under § 1125(a), Plaintiff must show (1) it has enforceable rights in the Tottenham Trademarks, and (2) Defendants made unauthorized use of the Tottenham Trademarks "such that consumers were likely to confuse the two."  *See Brain Pharma*, 858 F. Supp. 2d at 1355–56.  The requirements to prevail on a federal claim of trademark infringement are the same as the requirements to prevail on a federal claim of false designation of origin.  *See Suntree Techs.*, 693 F.3d at 1346; *Chanel, Inc.*, 362 F. Supp. 3d at 1262; *Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1284–85.

Therefore, the Court's findings in its analysis of Count I, *see supra* Section III.A.1, apply to Count II.  The Court finds that the Complaint alleges sufficient factual matter to establish that Defendants made unauthorized use of the Tottenham Marks such that consumers were likely to

confuse them with Defendants' counterfeit products. *See Brain Pharma*, 858 F. Supp. 2d at 1355–56.  Because the elements of false designation of origin under § 1125(a) have been met, Plaintiff has stated a claim to relief that is plausible on its face. *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41.  Thus, Plaintiff is entitled to final default judgment on Count II. *See Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245.

## B. Permanent Injunction

As Plaintiff has shown it is entitled to final default judgment on Counts I, and II, *see supra* Section III.A, the Court now analyzes whether a permanent injunction against Defendants is an appropriate remedy, *see* 15 U.S.C. § 1116(a).  Because a defendant's failure to appear or respond makes it difficult for a plaintiff to stop further infringement without an injunction, injunctive relief is still available in cases of default judgment. *See Chanel, Inc.*, 362 F. Supp. 3d at 1263; *Agad*, 911 F. Supp. at 1509–10.

To obtain a permanent injunction, Plaintiff must show it has suffered irreparable harm, legal remedies would not sufficiently redress the harm suffered, the balance of hardships favors granting Plaintiff equitable relief, and a permanent injunction would not undermine the public interest. *See Angel Flight of Georgia, Inc.*, 522 F.3d at 1208.  Plaintiff satisfied the first prong of the permanent injunction test because the Court presumed Plaintiff suffered irreparable harm after it prevailed on its trademark infringement claim. *See Tiramisu Int'l LLC*, 741 F. Supp. 2d at 1287 & n.4; *Amoco Prod. Co.*, 480 U.S. at 546 n.12; 15 U.S.C. § 1116(a).  Injunctive relief has historically been considered an appropriate remedy in trademark and unfair competition cases because monetary damages alone would not sufficiently redress harms resulting from ongoing infringement, satisfying the second prong of the permanent injunction test. *See Agad*, 911 F. Supp. at 1509–10.

The Court must balance the injury to Plaintiff and Defendant to determine whether injunctive relief is appropriate. *See Angel Flight of Georgia, Inc.*, 522 F.3d at 1208. Plaintiff has "expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the [Tottenham] Trademarks" resulting in "widespread fame, outstanding reputation, and significant goodwill." *See* ECF No. [1] at ¶¶15-16. Tottenham Products are manufactured "to the highest quality standards." *See* ECF No. [1] at ¶13. Plaintiff will continue to "suffer irreparable harm to its reputation and the goodwill of the Tottenham Trademarks" without injunctive relief, *see* ECF No. [1] at ¶¶13, 36, because Plaintiff would have no control over the quality of products associated with it. *See Tiramisu Int'l LLC*, 741 F. Supp. 2d at 1287 (explaining that confused consumers who buy the infringing product and are unsatisfied with it "might stop purchasing the original" product, which would leave the mark's owner "at the mercy" of the infringer because it had "no control over the quality" of the infringing product). Defendants, on the other hand, would suffer "no legitimate hardship by being forced to stop" using the Tottenham Trademarks as they did not have a right to use them in the first place. *See Tiramisu Int'l LLC*, 741 F. Supp. 2d at 1288. Therefore, the balance of hardships favors Plaintiff and satisfies the third prong of the permanent injunction test. *Id.*

As to the last prong of the permanent injunction test, the Eleventh Circuit has explained that permanent injunctions can serve the public interest because "the public as a whole has a paramount interest not to be confused" by a defendant's infringement. *See Tiramisu Int'l LLC*, 741 F. Supp. 2d at 1288 (quotation marks omitted). It has also recognized that complete injunctions against infringers in ordinary trademark infringement cases are "the order of the day" because "the public deserves not to be led astray by the use of inevitably confusing marks." *Angel Flight of Georgia, Inc.*, 522 F.3d at 1209. Thus, the Court finds that preventing Defendants from

using Tottenham Trademarks best serves the public interest because products bearing Defendants' counterfeit marks will likely cause consumer confusion. *See supra* Section III.A.1.

Plaintiff has, therefore, satisfied all prongs of the permanent injunction test. *Angel Flight of Georgia, Inc.*, 522 F.3d at 1208. Accordingly, I respectfully **RECOMMEND** that a permanent injunction **BE ISSUED** against Defendants prohibiting them from using the Tottenham Trademarks or the confusingly similar counterfeit marks they have been using. *See* 15 U.S.C. § 1116(a); *Chanel, Inc. v. Replicachanelbag*, 362 F. Supp. 3d 1256, 1264 (S.D. Fla. 2019) (noting that a court's broad equity powers allow it to fashion whatever kind of injunctive relief is necessary to stop a defendant's infringing activities).

## C. Other Equitable Relief

Along with a permanent injunction, Plaintiff asks the Court to order additional equitable relief by "maintain[ing] the asset restraint" on Defendants' funds pursuant to Rule 64 and ordering the third-party providers to transfer such assets to Plaintiff as full or partial satisfaction of any monetary judgment entered in Plaintiffs' favor. *See* ECF No. [32] at 14. The Court's broad equity powers allow it to fashion whatever relief is necessary to stop or remedy infringing activities in a particular case. *See, e.g.*, *Swann*, 402 U.S. at 15; *Bausch & Lomb Optical Co.*, 321 U.S. at 724. Further, Rule 64 provides that "at the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment," including attachment and garnishment. Fed. R. Civ. P. 64(a)-(b). Here, the Court already ordered that Defendants' assets be frozen to preserve them in the event of a final judgment. *See* ECF No. [17]. The Court finds it appropriate to extend the asset freeze order beyond the entry of the final judgment because the entry of a judgment does not lessen the risk that Defendants may transfer or hide their assets, and

the Court finds it appropriate to require the third-party providers to transfer such assets to satisfy any monetary judgment. Accordingly, I respectfully **RECOMMEND** that the Final Default Judgment **CONTINUE** the asset restraint on Defendants' funds. And because the Court also has the inherent authority to order the transfer of any assets that were restrained to assure the availability of permanent relief, *see Levi Strauss & Co.*, 51 F.3d at 987, I further respectfully **RECOMMEND** that the Final Default Judgment **TRANSFER** all funds currently restrained or held on account of Defendants by financial institutions to Plaintiff, up to and including the total amount of judgment, *see* Fed. R. Civ. P. 64-65. 15 U.S.C. § 1117; 28 U.S.C. § 1651(a), as set forth below.

### D. Statutory Damages

Finally, Plaintiff requests an award of statutory damages pursuant to 15 U.S.C. § 1117(c). *See* ECF No. [1] at 16; ECF No. [32] at 7. The federal trademark statute allows Plaintiff to recover an award of statutory damages as a remedy for infringement rather than actual damages. *See* 15 U.S.C. § 1117(c). The damages awarded may range from $1,000 to $200,000 per counterfeit mark per type of good sold, and if the infringement is considered willful the maximum award increases to $2,000,000 per mark per type of good. *Id.* § 1117(c)(1-2).

Here, Plaintiff requests statutory damages in the amount of $100,000 per Defendant, asserting willful infringement. *See* ECF No. [32] at 9, 15. Defendants promoted, distributed, advertised, offered for sale, or sold at least one type of good bearing at least one of the Tottenham Trademarks. Defendants' use of counterfeit marks can be deemed willful because their efforts to hide their identities suggest they knew they were using Plaintiff's Tottenham Trademarks and they attempted to evade Plaintiff's enforcement. *See Arista Records, Inc*, 298 F. Supp. 2d at 1313; ECF No. [1] at ¶24. Furthermore, willful infringement can also be inferred from default. *See Arista*

*Records, Inc.*, 298 F. Supp. 2d at 1313; *see besumart.com*, 240 F. Supp. 3d at 1292.  Thus, the Court finds that Plaintiff is entitled to statutory damages.

The Court further finds that statutory damages of $100,000 against each Defendant is sufficient to deter them and others from counterfeiting the Tottenham Trademarks, compensate Plaintiff, and punish Defendants pursuant to 15 U.S.C. § 1117(c).  *See Chanel, Inc. v. Sea Herro*, 234 F. Supp. 3d 1255, 1263 (S.D. Fla. 2016).  Accordingly, I respectfully **RECOMMEND** that Plaintiff **BE AWARDED** $100,000 against each Defendant as statutory damages for trademark infringement.

## IV.   Conclusion

Accordingly, I respectfully **RECOMMEND** that Plaintiff's Motion for Entry of Default Judgment, **ECF No. [32]**, be **GRANTED** as follows:

1. Final Default Judgment **BE ENTERED** in favor of Plaintiff and against Defendants as to all counts of the Complaint, *see* Fed. R. Civ. P. 55 and 58;

2. Defendants, along with their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them, **BE PERMANENTLY RESTRAINED AND ENJOINED**, *see* Fed. R. Civ. P. 65, from:

   a. using the Tottenham Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine Tottenham product or not authorized by Plaintiff to be sold in connection with the Tottenham Trademarks;

CASE NO. 25-CV-20476-MOORE/Elfenbein

b. passing off, inducing, or enabling others to sell or pass off any product as a genuine Tottenham product or any other product produced by Plaintiff, that is not Plaintiff's or not produced under the authorization, control or supervision of Plaintiff and approved by Plaintiff for sale under the Tottenham Trademarks;

c. committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

d. further infringing the Tottenham Trademarks and damaging Plaintiff's goodwill; and

e. manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiff, nor authorized by Plaintiff to be sold or offered for sale, and which bear any of Plaintiff's trademarks, including the Tottenham Trademarks, or any reproductions, counterfeit copies or colorable imitations thereof.

3. Plaintiff **BE AWARDED** the following equitable relief:

a. To give practical effect to the Permanent Injunction, upon Plaintiff's request, any third party with actual notice of the Final Default Judgment who is providing services for any of the Defendants, or in connection with any of the Defendants' Online Marketplaces, including, without limitation, any online marketplace platforms such as eBay, Inc. ("eBay"), Alipay,

AliExpress, Alibaba Group Holding Ltd., and Alibaba.com Singapore E-Commerce Private Limited (collectively, "Alibaba"), Amazon.com, Inc. ("Amazon"), Wish US Holdings LLC ("Wish.com"), Etsy, Inc. ("Etsy"), DHgate.com ("DHgate"), WhaleCo Inc. ("Temu"), ByteDance Ltd., TikTok Ltd., TikTok Inc., and TikTok LLC (collectively "TikTok"), and Walmart, Inc. ("Walmart") (collectively, the "Third Party Providers"), shall within seven (7) calendar days of receipt of such notice, disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the Tottenham Trademarks.

b.  The Third-Party Providers shall, within seven (7) calendar days of receipt of the Final Default Judgment, permanently restrain and enjoin any accounts connected to Defendants' Seller Aliases or the Online Marketplaces from transferring or disposing of any funds (up to the statutory damages awarded in Paragraph 4 below) or other of Defendants' assets.

c.  All monies (up to the amount of the statutory damages awarded in Paragraph 4 below) currently restrained in Defendants' financial accounts, including monies held by the Third-Party Providers, are hereby released to Plaintiff as partial payment of the above-identified damages, and the third-party providers are ordered to release to Plaintiff the amounts from Defendants' financial accounts within seven (7) calendar days of receipt of the Court's Final Default Judgment.

    d.  Pursuant to 15 U.S.C. § 1116, The All Writs Act, 28 U.S.C. § 1651(a), Federal Rule of Civil Procedure 65, and the Court's inherent authority, upon Plaintiff's request, the Third-Party Providers shall within seven (7) calendar days:

        (i)    locate all accounts and funds connected to Defendants' Seller Aliases and Online Marketplaces, including, but not limited to, any financial accounts connected to the information listed in Schedule A hereto, the e-mail addresses identified in Exhibit 2 to the Declaration of Matthew Collecott, and any e-mail addresses provided for Defendants by third parties;

        (ii)    restrain and enjoin such accounts or funds from transferring or disposing of any money or other of Defendants' assets; and

        (iii)    release all monies, up to the below-identified statutory damages award, in Defendants' financial accounts to Plaintiff as partial payment of the damages awarded in paragraph 4 below within seven (7) calendar days of receipt of the Court's Final Default Judgment.

4.    Plaintiff **BE AWARDED** $100,000.00 against each Defendant pursuant to 15 U.S.C. § 1117(c), for which let execution issue forthwith, based upon the Court's finding that each Defendant infringed at least one trademark on one type of good. The Court considered both the willfulness of each Defendant's conduct and the deterrent value of the award imposed, and the award falls within the permissible statutory range under 15 U.S.C. §1117(c).

CASE NO. 25-CV-20476-MOORE/Elfenbein

5.      Plaintiff **BE AWARDED** interest from the date of the Final Default Judgment, compounded annually pursuant to the provisions of 28 U.S.C. § 1961.

6.      The bond posted by Plaintiff in the amount of $10,000.00 **BE RELEASED** by the Clerk of the Court.

7.      The Court **RETAIN** jurisdiction to enforce its Final Default Judgment and permanent injunction.

Pursuant to Local Magistrate Rule 4(b), the parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable K. Michael Moore, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida on August 12, 2025.

**MARTY FULGUEIRA ELFENBEIN**
**UNITED STATES MAGISTRATE JUDGE**

cc:  All Counsel of Record

CASE NO. 25-CV-20476-MOORE/Elfenbein

**Tottenham Hotspur Limited v. The Partnerships and Unincorporated Associations Identified on Schedule "A" - Case No. 25-cv-20476-KMM-MFE**

# Schedule A

| Defendant Online Marketplaces | | |
|---|---|---|
| No. | URL | Name / Seller Alias |
| 1 | unitedfootballjersey.com | Secure Merchant ID: NK8B2JATCA4ES |
| 2 | unitedfootballjersey.com | Secure Merchant ID: BL882LGV4Z2MG |
| 3 | unitedfootballjersey.com | Secure Merchant ID: T67XKSNHSMTRY |
| 4 | unitedfootballjersey.com | Secure Merchant ID: GWH58LPYV8QUW |